IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MURDICE HARMON,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14-cv-4825 |
| v. ) | |
| ) | Judge Blakey |
| **METROPOLITAN LIFE INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
| Defendant. ) | |

# MetLife's Brief Supporting Summary Judgment

Martin Harris, Esq.
HARRIS & AFFILIATES, Ltd.
515 North State Street – Suite 2800
Chicago, IL 60654
Ph: (312) 644-1800
Marty@mharrislaw.com

Attorney for the defendant, MetLife

Murdice Harmon ("plaintiff") is a black female. For six years, MetLife employed her as a Financial Services Representative (**"FSR"**), which is a sales position.

On April 17, 2013, plaintiff repeatedly yelled at Jennifer DesGroseilliers (**"Jen D"**), the highest ranking manager where plaintiff worked. Jen D ordered plaintiff to go home for the rest of the day, but plaintiff would not leave, so Jen D discharged her for insubordination.

This discharge is the only employment action over which plaintiff has asserted a claim. She claims that when MetLife discharged her, it violated Title VII, a federal statute, in two ways:

- **Race Discrimination** (she says she was discharged because she is black).

- **Retaliation for Complaining About Race Discrimination** (she says she was discharged to punish her for pursuing an EEOC charge).

Plaintiff also asserts duplicate claims under a state statute, the Illinois Human Rights Act ("IHRA"). Finally, under a different state statute, the Illinois Wage Payment and Collection Act ("Wage Act"), plaintiff asserts another retaliation claim, which again focuses on her discharge:

- **Retaliation for Demanding Full Payment of Wages** (she says MetLife discharged her because she protested two "fees" it planned to deduct from her commissions).

Summary judgment should be granted on all claims. MetLife has articulated a non-discriminatory / non-retaliatory reason for discharging plaintiff. Undisputed facts prove she was insubordinate and acted inappropriately, and no evidence raises a genuine question of pretext.

Not only does the law dictate that these claims must fail, so does common sense. For example, Jen D was the decision-maker for this discharge, so she is the person plaintiff accuses of discrimination. It is undisputed that Jen D's wife is black, she adopted a black child, and she never said anything racially offensive. (SOF, ¶¶42-43).[1] Jen D did not discriminate because of race. Summary judgment exists for cases like this, "to avoid a useless trial ... where it is quite clear what the truth is." Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985).

---

[1] "SOF" refers to MetLife separately and simultaneously filed Statement Of Facts, pursuant to Local Rule 56.1.

## Summary Of The Facts

### A. Background: Plaintiff Despised and Distrusted All MetLife Managers Because She Never Got Over One Incident from Early in Her Career

In 2007, shortly after plaintiff was hired, her first supervisor, Paris Lewis, cheated her out of two commissions to obtain a bonus for himself. (SOF, ¶47). Lewis is black, and he did the same thing to a white FSR. (SOF, ¶49). MetLife demoted Lewis and required him to repay plaintiff. (SOF, ¶48). Still, this incident forever colored how she viewed MetLife, especially anyone in management. In her words, it left "a nasty taste in my mouth that won't go away.... I really don't trust anyone in that office." (Exh. 2, pp, 3, 4). Plaintiff viewed everything at MetLife through the lens of this incident, and seemed to "paint[] all MetLife managers with the same brush," distrusting all of them because of Lewis. (Swick, ¶9). *See also* (Exh. 2, p. 1) (because of Lewis, she says, "[I was] always looking over [my] shoulder to keep someone from using [me]").

### B. Events that Led to the April 17 Meeting: Plaintiff's Outbursts Over Lead Fees

In March 2013, <u>a computer</u> generated an *automated* notice. It notified plaintiff that for two sales she made, her compensation credit would be reduced by deducting an "e-lead fee," because MetLife had emailed leads ("e-leads") to her listing those customers' names. Plaintiff felt no fee should be assessed for these leads, because she already had relationships with both customers before MetLife sent those leads. She was right, but this home office computer was not programmed to check for pre-existing relationships. This was a *common* occurrence, so MetLife had a simple process for FSRs to dispute e-lead fees and have them cancelled. (SOF, ¶¶17, 40). Once plaintiff *eventually* followed that process, these fees were promptly canceled. (SOF, ¶19).

Before that, though, plaintiff lashed out. First she called her agency's marketing manager, Michelle Lopez, who tried to explain the process for protesting e-lead fees, but plaintiff insisted she was too busy for that. She accused Lopez of "not understand[ing] the plight of salespeople"; "tak[ing] money from her"; and "just sit[ting] around and collect[ing] a paycheck." (SOF, ¶20).

2

Lopez assigned Ryan O'Connor to *help plaintiff* get the fees canceled. When O'Connor (who had never met plaintiff) called, plaintiff subjected him to a torrent of abusive comments, *e.g.*: (a) "The slave days are over"; (b) "The time of white males being the dominant masters is over"; and (c) "Shame on you, you're trying to take money from me." (SOF, ¶21).

These outbursts were reported to Jen D. (SOF, ¶23). When she contacted Employee Relations for advice, she also learned that in the past, plaintiff subjected other managers to similar outbursts. (SOF, ¶24). To ensure that plaintiff's concerns were addressed, and to coach her about treating people more respectfully, Jen D scheduled a meeting with plaintiff. (SOF, ¶25).

        C.        The April 17 Meeting: Plaintiff is Discharged for Insubordination

● **The First Session.** Jen D and plaintiff met on April 17, 2013, in Jen D's office. After agreeing the lead fee issue was resolved, plaintiff launched into *old* grievances, mainly the Paris Lewis incident. She described MetLife managers as liars who "stole" from her, adding: "Snoopy needs to get a suit because he's a pimp!" (SOF, ¶26) (Snoopy is MetLife's official mascot). Jen D warned her about that language and urged her to focus on current issues within Jen D's control. But plaintiff began yelling at Jen D, so loudly that several people heard it through a closed door. (SOF, ¶27). Then plaintiff decided she did not feel up to continuing and left – before Jen D could coach her about treating people respectfully, a key item on Jen D's agenda. (SOF, ¶28).

● **The Follow-Up Session.** Twenty-five minutes later, an enraged plaintiff returned to Jen D's office. This time she never sat down, barely let Jen D get a word in edgewise, used the same inappropriate language she had been warned about, and screamed so loudly that people outside the office heard her *again* (accusing Jen D of "ambushing" her and "setting [her] up"). (SOF, ¶29).

> I did not sit, but I told her I felt as though I had been set up. I asked her why she was doing this to me.... I told her ... MetLife was ... try[ing] to force me to quit.... I told her I was tired of having to beg and feeling indifferent. [I said] MetLife was getting more of my money than I got, and I felt Snoopy wanted to be a pimp....

3

(Exh. 3B, p. 3). To get plaintiff to leave, Jen D stood up and walked to the door. Plaintiff followed her to the door but kept screaming. They were standing so close (in the doorway) that plaintiff was in Jen D's face, causing Jen D to fear it might escalate into a physical altercation:

> While I'm telling her I really need you to go back to your office, I'm standing up from my desk and I'm moving towards the door, assuming that ... I can get her to follow me [out]. I'm much taller than she is, so I wasn't at any point [afraid] that she could physically [hurt] me. However, she was angry enough that I thought it was likely that she would have crossed that boundary [and tried]. I mean[, the way she was] yelling ... I have never experienced anybody in a workplace behaving the way that she was behaving.
> \* \* \*
> She was still giving me orders, ... refusing to leave, but it was through her mannerism. Like she was just talking over me. It was like she was in this, you know, crazy state.

(Jen D, pp. 94-95). *See also* (SOF, ¶30). Eventually, plaintiff left Jen D's office.

- **The Final Confrontation.** After calling Employee Relations for advice, Jen D found plaintiff in the break room and instructed her to go home for the rest of the day. (SOF, ¶¶31-32). Plaintiff already had been insubordinate, but as long as she complied now, Jen D planned to let it go at a 1-day suspension. (SOF, ¶31). But plaintiff refused. (SOF, ¶32). Instead, she pulled out her cell phone to show Jen D a project she had scheduled for that day, and argued she could do it without leaving her office, so she would not need to interact with any co-workers. (SOF, ¶32). When plaintiff refused to leave, Jen D discharged her on the spot for insubordination. (SOF, ¶33).

D.   Misc. Other Alleged "Incidents"

Based on discovery, plaintiff likely will bring up two additional "incidents," neither of which had any bearing on her termination. These are red herrings. The only point worth noting is the obvious, non-discriminatory reason for each decision:

- **2012: Two-Month Delay in Receiving a New Laptop.** Plaintiff's laptop "refresh" was postponed due to a new rule issued by MetLife's home office, which stated that all FSRs whose sales fell below a certain level must wait until 2013. It is undisputed that: (a) plaintiff's production was below that level; and (b) more than 175 FSRs, many white, were postponed for the same reason. (SOF, ¶¶64-67).

4

- **2013: Cutting Off DTP Leads.** Under MetLife's published rules, plaintiff was ineligible for Deliver The Promise ("DTP") leads. For several years, though, her local managers ignored those rules and gave plaintiff (and other ineligible FSRs) DTP leads. When Jen D arrived she ended that practice, instructing her staff to enforce company rules. It is undisputed that at the same time, Jen D cut off DTP leads to a dozen ineligible white FSRs; she did not single out plaintiff. (SOF, ¶¶54, 58-63).

## Legal Analysis

Summary judgment is required "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). The Court must view the evidence in the light most favorable to plaintiff. Id. at 255. If the evidence still is "so one-sided as to make a trial an exercise in futility," summary judgment should be granted. Palucki v. Sears, Roebuck., 879 F.2d 1568, 1573 (7th Cir. 1989).

### I. The Title VII Race Discrimination Claim

#### A. Analytical Framework

Absent direct evidence (not alleged here), discrimination claims are analyzed under the McDonnell-Douglas burden-shifting framework. First, plaintiff must establish a prima facie case. Next, a burden of production shifts to the employer to articulate a non-discriminatory reason for the discharge. Finally, the burden shifts back to plaintiff: to survive summary judgment, she must raise a genuine question that the company's stated reason is pretextual. Dickerson v. Bd. of Tr. of Comm. Coll., 657 F.3d 595, 601 (7th Cir. 2011).

Solely for purposes of this motion, MetLife will assume plaintiff can establish a prima face case. Thus, the analysis proceeds to stage two: MetLife's non-discriminatory reason.

MetLife explained why it discharged plaintiff: she was insubordinate. At stage two of the McDonnell-Douglas analysis, "there is no doubt that insubordination is a legitimate reason for discharge." Daggert v. Chi. Transit Auth., 1998 U.S. Dist. LEXIS 18723, *18 (N.D. Ill.). See also McClendon v. Indiana Sugars, 108 F.3d 789, 797 n.7 (7th Cir. 1997) (same); Daniels v.

5

Fed. Reserve Bank, 2004 U.S. Dist. LEXIS 3412, *50 (N.D. Ill.) (plaintiff "yelled and screamed [at her managers] and totally lost control"; that is a non-discriminatory reason for discharge). Thus, as in most cases, the summary judgment analysis here hinges on the "pretext" stage.

### B. Plaintiff Cannot Raise a Genuine Question of Pretext

A plaintiff may establish pretext directly by showing that the employer was "more likely than not motivated by a discriminatory reason," or circumstantially by presenting evidence that the employer's explanation is "not worthy of credence." Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 807 (7th Cir. 1999). Neither potential method avails plaintiff here.

#### 1. There is No Evidence that Race was the Real Reason for Discharge

In an effort to show that race discrimination, not insubordination, was likely the real reason for her discharge, plaintiff alleges that on a few *other* occasions, she was subjected to race discrimination[2]: (a) in 2007, when Paris Lewis stole two commissions; (b) in 2012, when her laptop refresh was briefly postponed; (c) in 2013, when a computer automatically notified her that two e-lead fees would be assessed; and (d) in 2013, when Jen D cut off DTP leads to all ineligible FSRs, including plaintiff. As a matter of law, this misguided argument goes nowhere.

To begin with, undisputed facts prove that none of the other "incidents" occurred because of race; each occurred for obvious, non-discriminatory reasons. (Supra, pp. 2, 4-5). Plaintiff's contrary view rests on nothing but her subjective belief that racial animus was behind most bad things that happened at MetLife. Of course, she lacks personal knowledge about other people's thoughts. Thus, as a matter of law, her *opinion* about their motives is not competent evidence. "If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves,

---

[2] She has not asserted separate *claims* over those other incidents. Indeed, she concedes she cannot: some would be time barred (e.g., the Paris Lewis incident in 2007; the laptop issue in August 2012), and for the rest she suffered no injury (e.g., lead fees and removal from DTP). Instead, plaintiff seeks to use these other "incidents" to raise an inference that if discrimination occurred on other occasions, it probably occurred when she was discharged, too.

6

create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." Mlynczak v. Bodman, 442 F.3d 1050, 1058 (7th Cir. 2006).

Further, "only the decision-maker's motive matters in determining whether a[ discharge] ... was discriminatory." Freund v. Westlake Import Motors, 1998 U.S. Dist. LEXIS 2486, *6 (N.D. Ill.). Jen D did not work for MetLife when the Paris Lewis and laptop incidents occurred. Even if those events somehow suggest that *someone* was racially biased, it would be a *former* manager who was gone long before plaintiff's discharge. "The animus of non-decision makers is generally irrelevant." Swanson v. Allstate Ins. Co., 102 F. Supp. 2d 949, 966 (N.D. Ill. 2000).

Finally, undisputed facts overwhelmingly show that Jen D is *not* racially biased: her wife is black, she adopted a black child, etc. (SOF, ¶¶42-43). Although not dispositive, these facts are surely relevant in assessing whether plaintiff has raised a genuine issue that race was Jen D's real motive for the discharge. Harris v. Warrick Cty Sheriff's Dept., 666 F.3d 444, 449 (7th Cir. 2012) (evidence of non-bias "is unlikely to be dispositive in very many cases, but we have approved its use" for summary judgment); Garber v. Mad Brewer, Inc., 773 F. Supp. 2d 765, 787 (N.D. Ill. 2011) (the same manager who fired plaintiff had recently hired her; the "inference" of non-bias this creates is "one more thing stacked against" plaintiff in the summary judgment analysis).

### 2. She Cannot Show that MetLife's Reason is "Unworthy of Credence"

The other potential way to prove pretext is by showing that MetLife stated reason for this discharge is unworthy of credence. (Supra, p. 6). "To demonstrate pretext [this way, plaintiff] must show that her employer did *not honestly believe* in the reasons it gave for terminating her." Everroad v. Scott Truck Sys., 604 F.3d 471, 478-79 (7th Cir. 2009) (italics added).

Plaintiff alleges that a few white FSRs yelled or cursed in the office without being fired, adding that when she did the same thing (in her opinion), she was fired. In theory, proof that "*similarly situated*" white FSRs were disciplined less severely than plaintiff could expose an

7

explanation as unworthy of credence. Lenoir v. Roll Coater, 13 F.3d 1130, 1133 (7th Cir. 1993) (it may suggest this offense is "not sufficient to warrant discharge" *in this decision maker's eyes*, so s/he must be lying when s/he says that is why s/he fired plaintiff). This way of proving pretext is only valid, though, if the comparison is apples-to-apples – if the white FSRs were "directly comparable to the plaintiff in all material respects." Patterson v. Ind. Newspapers, 589 F.3d 357, 365-66 (7th Cir. 2009); Spath v. Hayes Wheels Int'l-Ind., 211 F.3d 392, 397 (7th Cir. 2000) (the "similarly situated" requirement "is fundamental"). As a matter of law, it is not satisfied here.

● **Different Offenses**. To be "similarly situated," both plaintiff and the white comparators must have "engaged in similar conduct, without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). As plaintiff admits, no white FSR ever yelled *at a manager*; they only yelled *at support staff*. (SOF, ¶¶44-46). Common sense suggests that yelling at a high-ranking manager (Jen D) is more likely to result in severe discipline than yelling at clerical staff. *See* Sullair P.T.O., Inc. v. NLRB, 641 F.2d 500, 503-04 (7th Cir. 1981) ("vulgar language was not uncommon" in this workplace, but no one else directed profanity *at his/her supervisor*, so the others were not similarly situated to plaintiff, who swore at his manager).

Further, unlike plaintiff, no white FSR openly disobeyed a manager, let alone a Managing Director like Jen D. (SOF, ¶45). Insubordination compounded by disrespectful behavior (yelling) is obviously more serious than the same disrespectful behavior (yelling) standing alone. Taffe v. Ill. Dept. of Empl. Sec., 229 F. Supp. 2d 858 (N.D. Ill. 2002) (another employee "yelled at" a co-worker, as did plaintiff, but unlike plaintiff, the other employee's "[mis]conduct did not involve disobeying a supervisor's direct order"); Everroad, 604 F.3d at 478-80. As a matter of law, the nature of the offense plaintiff committed (insubordination) is so different than what the white FSRs did, it precludes finding that they were similarly situated.

8

● **Different Decision-Makers**. To be "similarly situated," both plaintiff and the white FSRs also must have "dealt with the same supervisor"; i.e., "the same decision-maker" must have made both decisions. Ellis v. U.S. Postal Service, 523 F.3d 823, 826 (7th Cir. 2008). Undisputed facts prove that is not so here. The incidents plaintiff cites, where white FSRs yelled at support staff, occurred *before Jen D was hired*. (SOF, ¶¶45-46). As a matter of law, a *different manager's* failure to take action "sheds no light" on whether *Jen D* honestly views this offense as warranting discipline. Little v. Ill. Dept. of Revenue, 369 F.3d 1007, 1012 (7th Cir. 2004).

### 3. Conclusion (re: this claim)

Jen D viewed plaintiff's behavior as insubordinate. The record cannot support a finding that Jen D's explanation is "unworthy of credence," nor a finding that Jen D was motivated by racial animus. MetLife is entitled to summary judgment on the discrimination claim.

## II. The Title VII Retaliation Claim

In late March / early April 2013, plaintiff told her immediate supervisor (Joe Nicholson) and MetLife's Employee Relations department that she was thinking about contacting the EEOC. (SOF, ¶38). She claims she was discharged in retaliation for mentioning this possibility.

"The plaintiff in a retaliation case [has] two (and only two) ... routes to ... preventing summary judgment": a "direct" method, and an "indirect" method. Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002). The "[direct] method is ordinarily more onerous." Id. It requires: (a) "something akin to an admission from the employer that it took action against the employee because of his protected activity," which is rare; or more often (b) "a 'convincing mosaic' of circumstantial evidence" that points *directly* to a "causal connection" between plaintiff's protected activity and her discharge. Id.; and Cantley v. Ind. Univ. Health, 2015 U.S. Dist. LEXIS 129972, *18 (S.D. Ind.). As a result, the usual way in which a plaintiff

9

tries to establish a claim is by using the "indirect method," which is an "adaptation of McDonnell Douglas to the retaliation context." Haywood v. Lucent Techs., 323 F.3d 524, 531 (7th Cir. 2006). Here, plaintiff seeks to utilize both methods. She cannot succeed under either approach.

### A. The "Direct" Method

"Under the direct method ..., a plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." Smith v. Lafayette Bank, 674 F.3d 655, 657 (7th Cir. 2012).

It is undisputed that plaintiff engaged in protected activity (pursuing an EEOC charge), and her discharge was an adverse action. That leaves the third element: a "causal connection between the two." In an effort to show a causal link, plaintiff relies on: (a) the timing of events (*i.e.*, "temporal proximity"); (b) an alleged threat by Peter Nejad; and (c) an alleged threat by Jen D. Both individually and collectively, these facts are insufficient as a matter of law.

#### 1. Temporal Proximity

Three weeks after plaintiff mentioned the possibility of pursuing an EEOC charge (her protected activity), she was discharged (the adverse action). In her view, that temporal proximity is so suspicious that it must prove a causal link between the two events. She is wrong.

This is not a case where a discharge followed right on the heels of the protected activity (*e.g.*, the same day, or within a few days). Rather, there was a 3-week gap. A gap of "two or three weeks" is "nothing more than weak proximity at best," so it lacks probative value in the summary judgment analysis. Silverman v. Bd. of Educ., 637 F.3d 729, 736 (7th Cir. 2011).

At any rate, "suspicious timing alone is rarely sufficient to defeat a motion for summary judgment." Cole v. Illinois, 562 F.3d 812, 816 (7th Cir. 2009). "Suspicious timing may be just that – suspicious – and a suspicion is not enough to get past a motion for summary judgment." Kidwell v. Eisenhauer, 679 F.3d 957, 966 (7th Cir. 2012); *see also* Tomanovich v. City of

10

Indianapolis, 457 F.3d 656, 665 (7th Cir. 2006) ("while there is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, ... it is clear that mere temporal proximity is not enough"); Stone, 281 F.3d at 644 (same).

Rather than focusing only at how much time elapsed (from the protected activity to the discharge), "[w]e have ... underscored the importance of context in assessing whether an inference of causality is warranted." Davis v. Time Warner Cable of S.E. Wisc., 651 F.3d 664, 675 (7th Cir. 2011). When, as here, the context reveals an obvious, non-retaliatory explanation for the *timing* of a disciplinary action, such as a **"significant intervening event"** that triggered the discharge, temporal proximity evidence "falls flat ... [and] is insufficient to prevent summary judgment." Smeigh v. Johns Manville, Inc., 2010 U.S. Dist. LEXIS 100003, *13-14 (S.D. Ind.).

Here, there was a significant intervening event: plaintiff's outburst at Jen D on April 17. Jen D discharged her on the spot, right after plaintiff refused to go home. "Where a significant intervening event separat[es] an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." Kidwell, 679 F.3d at 967.

> The timing of events is often an important evidentiary ally of the plaintiff [especially if an adverse action] ... follows close on the heels of a protected act.... But "ally" does not mean "panacea." * * * [Plaintiff broke a rule shortly before he was fired.] * * * Th[at] was a significant intervening event separating [his protected activity] from his discharge. * * * To accept plaintiff's argument] that the [temporal] proximity of events here ... implies causation, ... we [would have to] close our eyes to ... the elephant in the room.

Davis, 651 F.3d at 675 (affirming summary judgment); *see also* Scholl v. Educ. Mgmt. Corp., 2012 U.S. Dist. LEXIS 127293, *36-37 (N.D. Ind.) (grants summary judgment for same reason).

### 2.     Nejad's Alleged Threat

According to plaintiff, on March 26, 2013, she told Regional V.P. Peter Nejad that she might talk to someone "outside MetLife" about discrimination, and he replied that she would "have regrets." (Harmon, pp. 138-41). Nejad strongly denies this allegation (Nejad, ¶¶4-5), but

11

solely for purposes of this motion, the Court must credit plaintiff's version. Even so, this alleged threat fails to defeat summary judgment because Nejad played no role in the discharge.

It is undisputed that Jen D was the sole decision-maker for this termination; Nejad was not consulted and did nothing to influence Jen D. (SOF, ¶¶34-35). "Under the direct method, plaintiff must provide direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason." Rogers v. City of Chicago, 320 F.3d 748, 754 (7th Cir. 2003), *overruled on other grounds by* Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013); Harris, 666 F.3d at 448 (same).

Threats by non-decisionmakers "are not probative of an intent to retaliate by the decision-maker." Long v. Teachers' Ret. Sys. of Ill., 585 F.3d 344, 351 (7th Cir. 2009); *see also* Smith v. Bray, 681 F.3d 888, 901 (7th Cir. 2012) (plaintiff said he would call a lawyer. Bianchetta replied that plaintiff "was going to be sorry" and made other "threat[s]." The court held: "These alleged statements are direct evidence only of Bianchetta's retaliatory animus – not Bray's"). In sum, comments by "nondecisionmakers" are "nothing more than stray remarks," and are "insufficient to block summary judgment." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 39 (1st Cir. 2007).

### 3. Jen D's Alleged Threat

During the April 17 meeting, Jen D instructed that if issues arose in the future, plaintiff should bring her concerns to her immediate supervisor, to Jen D, or to Employee Relations. (SOF, ¶36). Jen D was trying to explain the *internal* "chain of command" (who *within* MetLife plaintiff should go to) – a reaction to recent events, when plaintiff went over Jen D's head by calling Jen D's boss (Nejad) without talking to Jen D first. (SOF, ¶¶22, 36). Plaintiff seeks to twist this comment into something sinister, insisting it was a warning against going to the EEOC.

Undisputed facts preclude that conclusion. Plaintiff concedes that Jen D *never* mentioned the EEOC during this meeting. (SOF, ¶36). Further, by her own admission, plaintiff does not know what Jen D *really* said about this subject because, by the time this topic arose, plaintiff felt

12

so ill, so upset, and so confused, she was *unable to focus* on what Jen D was saying. (SOF, ¶36).

In sum, plaintiff is merely speculating about what Jen D intended this facially-innocent statement to mean, and her speculation rests solely on self-serving assumptions, not on what Jen D actually said. As a matter of law, plaintiff's "speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995).

### 4. Conclusion re: "Direct Evidence"

Plaintiff cannot succeed under the "onerous" direct method, because no facts strongly suggest that Jen D's decision was motivated by retaliatory animus. Instead, plaintiff must resort to the more common, "indirect" method, which utilizes the McDonnell Douglas framework.

### B. The "Indirect" Method

● **No Prima Facie Case.** "Under the indirect method," a prima facie case entails showing: "(1) [s]he engaged in a statutorily protected activity; (2) [s]he met the employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated less favorably than similarly situated employees who did not engage in … protected activity." Tomanovich, 457 F.3d at 664. As discussed earlier, no white FSR was "similarly situated" to plaintiff, because no white FSR yelled at and disobeyed Jen D. (Supra, pp. 7-9). "A plaintiff's failure to satisfy any one element of the prima facie case is fatal to [his/her] retaliation claim." Alexander v. Biomerieux, Inc., 485 F. Supp. 2d 924, 935 (N.D. Ill. 2005).

● **No Pretext.** Alternatively, even if plaintiff could state a prima facie case, she would still lose at stage three of the burden-shifting analysis. MetLife has articulated a legitimate, non-retaliatory reason for her discharge, and the evidence fails to raise a genuine question that this explanation is pretextual. The analysis here is the same as for the race discrimination claim.

13

● **A Final Point.** Plaintiff may allege that she exploded at Jen D while protesting alleged discrimination, and may argue that as a result, retaliation laws immunize her from discipline. That would be misguided. "The rights afforded to the employee [for protected activity] are a shield against employer retaliation, not a sword with which one may threaten or curse supervisors." Kahn v. U.S. Sec'y of Labor, 64 F.3d 271, 279 (7th Cir. 1995). "Employees are protected while presenting … complaints[, but that] does not give them carte blanche in choosing *the method* of presentation." NLRB v. Truck Drivers, 630 F.2d 505, (7th Cir. 1980) (italics added). If the protest takes an *inappropriate* **"form,"** such as "vulgarities," "threats of violence," or "insubordination," then "otherwise protected activity is removed from protection." Kahn, 64 F.3d at 279. *See also* Alexander, 485 F. Supp. 2d at 934-35 ("the Seventh Circuit has consistently" followed this rule).

For all of these reasons, the retaliation claim must fail as a matter of law, under both the direct method and the indirect method. MetLife is entitled to summary judgment on this claim.

## III.   The Two IHRA Claims

"In analyzing employment discrimination actions brought under the Human Rights Act, ... Illinois appellate court[s] have adopted the [same] analytical framework" federal courts use to "address[] claims brought under Title VII." Zaderaka v. Ill. Human Rights Comm'n, 545 N.E.2d 684, 687 (Ill. 1989); *see also* Guerrero v. T-Mobile USA, Inc., 2015 U.S. Dist. LEXIS 27466, *25 (N.D. Ill.) (the same is true for IHRA retaliation claims). Thus, summary judgment should be granted on both IHRA claims for the same reasons that apply to the parallel Title VII claims.

## IV.   The Wage Act Retaliation Claim

Plaintiff claims she was discharged in retaliation for disputing two e-lead fees that were going to be assessed against her. In her view, a discharge motivated by that reason would violate the Illinois Wage Payment & Collection Act ("Wage Act"), 820 ILCS 115/14(c).

There is no case law about this cause of action yet because, until 2011, a civil claim was

14

not available for Wage Act retaliation. Still, for *all types* of retaliation claims, whether they arise under the IHRA or under common law theories, "to survive a motion for summary judgment … Illinois law requires the plaintiff to offer affirmative evidence of causation" – *i.e.*, evidence of a causal link. Reid v. Neighborhood Assistance Corp., 749 F.3d 581, 587 (7th Cir. 2014).

Plaintiff cannot meet this burden. There is *zero* evidence that Jen D was angry at her for disputing two e-lead fees (totaling just $158). (SOF, ¶¶39-40). Plaintiff's dispute was not a big event. The computer *often* made mistakes, *dozens* of FSRs disputed similar fees, and managers *routinely* helped them obtain refunds. (SOF, ¶¶17,41). Indeed, it is undisputed that MetLife set up a process to *facilitate* resolving such disputes (SOF, ¶17), and Jen D's team *helped* plaintiff utilize that process to cancel these fees. (SOF, ¶¶20-21, 40) (Lopez and O'Connor explained the process and helped her submit the necessary documentation). When, as here, "[a]most everyone in the office, not just the plaintiffs, complained about the same issues, ... an inference of retaliatory intent [is] ... unreasonable." Reid, 749 F.3d at 589. Finally, upon learning that the home office agreed to cancel these fees, plaintiff's managers cheered: "That's great news!" (Exh. 85) and (SOF, ¶39). These facts are undisputed, and they show *the opposite* of retaliatory animus.

Plaintiff cannot overcome this total absence of 'causal link' evidence just by pointing to the timing of events, because Illinois courts follow the "temporal proximity" case law discussed earlier. Durbin v. Ill. Human Rights Comm'n, 2014 IL App (1st) 132621-U, *60 (2014).

Finally, "under Illinois law, the element of causation is not met if [Defendant] has a valid, nonpretextual basis for [the] discharg[e]." Taffe v. Ill. Dep't of Empl. Sec., 229 F. Supp. 2d 858, 873 (N.D. Ill. 2002). As shown earlier, plaintiff cannot raise a genuine question of pretext.

In sum, there is no evidence of a causal connection; *nothing* suggests Jen D wanted to punish plaintiff for disputing the e-lead fees, *and* there is no evidence of pretext. MetLife is entitled to summary judgment on the Wage Act claim – along with all other claims.

Respectfully submitted,


/s Martin Harris_____
Martin Harris, Esq.
HARRIS & AFFILIATES, Ltd.
515 North State Street – Suite 2800
Chicago, IL  60654
Ph: 312-644-1800
Marty@mharrislaw.com

Attorney for the defendant, MetLife


## Certificate of Service


I hereby certify that on October 23, 2015, I caused the foregoing MetLife's Brief Supporting Summary Judgment to be served on the following attorney of record for plaintiff, via the Court's ECF system:

Jonathan Goldman, Esq.
Law Offices of Goldman & Ehrlich
20 S. Clark – Suite 500
Chicago, IL 60603


___s/ Martin Harris_____
Attorney for MetLife

16