**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Murdice Harmon, | |
| Plaintiff, | Case No. 14-cv-4825 |
| v. | |
| Metropolitan Life Insurance Company, | Judge John Robert Blakey |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves an employment dispute between Plaintiff Murdice Harmon and her former employer, Defendant Metropolitan Life Insurance Company ("MetLife"). Plaintiff is an African-American female who began working for the Defendant in March 2007. In April 2013, Defendant terminated Plaintiff. Plaintiff claims that her discharge was motivated by racial discrimination and retaliation, and thus brings three causes of action: (1) race discrimination under Title VII of the Civil Rights Act of 1964, as amended, and the Illinois Human Rights Act ("IHRA"); (2) retaliation under Title VII and the IHRA; and (3) retaliation under the Illinois Wage Payment and Collection Act ("IWPCA"). On October 23, 2015, Defendant filed a motion for summary judgment as to all counts. Def.'s Mot. Summ. J. [25]. For the reasons explained below, that motion is granted.

## I.     Background[1, 2]

Defendant originally hired Plaintiff in March 2007.  DSOF ¶ 3.  Throughout her employment, Plaintiff worked as a Financial Services Representative ("FSR") in charge of selling insurance and other financial products to prospective MetLife customers.  *Id.* ¶ 2.  Between 2007 and 2009, Plaintiff was assigned to work at the MetLife agency in Orland Park, Illinois.  *Id.* ¶ 3.  In 2009, MetLife merged its Orland Park agency into its Oak Brook, Illinois, agency (although Plaintiff continued to work out of the Orland Park office).  *Id.*  In February 2013, MetLife merged its Oak Brook agency into its Downers Grove, Illinois, agency (once again, Plaintiff continued to work out of the Orland Park office).  *Id.*  Plaintiff remained assigned to the Downers Grove agency until her termination in April 2013.  *Id.*

According to Plaintiff, various employment disputes occurred over the course of her employment that prove Defendant treated white FSRs more favorably than their non-white co-workers:

[1] The facts are taken from the parties' Local Rule 56.1 statements and accompanying attachments. "DSOF" refers to Defendant's Local Rule 56.1 Statement of Facts [26], with Plaintiff's responses where applicable [35].  "PSOAF" refers to Plaintiff's Local Rule 56.1 Statement of Additional Facts [36], with Defendant's responses where applicable [39].

[2] Both parties raised general objections in their respective responses to the opposing party's Rule 56.1 statement.  Plaintiff objects that Defendant's Rule 56.1 statement does not include within each paragraph specific references to parts of the record to support the facts set forth.  Pl.'s Resp. to Def.'s Rule 56.1 Statement [35] 1-2.  Plaintiff further objects to the inclusion of immaterial facts, *id.* at 2, and complains that a myriad of Defendant's factual assertions are "argumentative," "vague," and/or not sufficiently "short."  *E.g.*, *id.* at ¶¶ 17, 29, 56.  In response, Defendant objects to Plaintiff's inclusion of "irrelevant allegations" in her own Rule 56.1 statement.  Def.'s Resp. to Pl.'s Rule 56.1 Statement [39] 3.  These objections are noted and overruled; the Court will consider both Rule 56.1 statements as written.  Defendant's remaining objection and request to strike unsworn testimony is discussed in notes 4 and 5, *infra.*

### a. The Paris Lewis Incident

First, when Defendant hired Plaintiff in 2007, Paris Lewis ("Lewis") was her immediate supervisor and the Managing Sales Director of Plaintiff's agency. DSOF ¶ 3. Lewis is African-American. *Id*. ¶ 49. In April 2007, Lewis improperly transferred partial credit for a pair of Plaintiff's sales to two other FSRs in order to obtain a bonus for himself. *Id*. ¶ 47. In mid-2008, Plaintiff complained about Lewis' actions to Defendant's Employee Relations Department. *Id*. ¶ 48. After investigating the issue, Defendant agreed with Plaintiff and disciplined Lewis by demoting him out of management and requiring him to repay Plaintiff her commission credits. *Id*.

### b. "Deliver the Promise" Leads

At the time of the Paris Lewis incident, Kim Taylor ("Taylor") was Plaintiff's second-level supervisor and the Managing Director of Plaintiff's agency. DSOF ¶¶ 47, 50. In 2009, to further remedy Lewis' improper transfer of Plaintiff's sales credits, Taylor arranged for Plaintiff to be admitted into Defendant's "Deliver the Promise" ("DTP") leads program. *Id*. ¶ 59. As part of the DTP program, Defendant's Marketing Department develops sales leads and forwards the names and contact information of potential customers to FSRs. DSOF ¶ 12. Normally, to be eligible for DTP leads, an FSR's annual sales production must reach a certain threshold. DSOF Attach. 12, at 1.

Taylor's employment with MetLife ended later in 2009, and Colleen Schueneman ("Schueneman") replaced Taylor as Managing Director. DSOF ¶¶ 50,

62. At year-end 2009, Plaintiff's sales production fell short of the DTP threshold. *Id.* ¶ 60. As a result, in mid-2010, Defendant's home office declared Plaintiff ineligible for DTP leads. *Id.* Despite this, Schueneman continued to provide Plaintiff with DTP leads in 2011 and 2012. *Id.* ¶ 62.

In January 2013, Jennifer DesGroseilliers ("DesGroseilliers") replaced Schueneman as Managing Director. DSOF ¶ 5. As Managing Director, DesGroseilliers oversaw all aspects of the newly-merged Downers Grove agency, including its strategic business plan, budget, hiring, and disciplining of approximately 150 employees. *Id.* Shortly after arriving, DesGroseilliers instructed her staff to identify FSRs who were receiving leads, including DTP leads, contrary to company policy. *Id.* ¶ 55. Plaintiff, among several others, was identified in that category. DSOF Attach. 41, at 49:1-50:9. DesGroseilliers ordered that approximately a dozen FSRs—many of whom were not African-American—stop receiving leads for which they did not qualify. DSOF ¶ 56. This included Plaintiff. *Id.* ¶ 63.

### c. Cost of Goods and Services

At MetLife locations, FSRs can be housed in either a hallway cubicle or a private, enclosed office. DSOF Attach. 42, at 75:18-76:19. Normally, use of a private office requires an FSR to pay Defendant rent for the space they occupy. *Id.* at 78:9-12. Such expense is included in a "Cost of Goods and Services" ("COGS") levy that is ultimately deducted from an FSR's pay. *Id.* at 78:13-79:15. However, DesGroseilliers' predecessors waived certain COGS charges, including rent for

private office space. DSOF ¶ 54. Upon her hiring, DesGroseilliers instructed her staff to ensure all FSRs, including Plaintiff, paid for private office space. DSOF Attach. 41, 19:2-20:18.

### d. Plaintiff's Laptop Computer

Defendant typically provided FSRs new laptop computers every three years (a program known as "refreshing"). DSOF ¶ 63. Plaintiff was scheduled to receive a new laptop in August 2012. *Id.* However, in the summer of 2012, Defendant's home office announced that laptop "refreshes" for FSRs whose production fell below a certain level would be postponed until 2013. *Id.* ¶ 64. This rule change impacted more than 175 FSRs, including Plaintiff. *Id.* ¶¶ 65-66. As a result, Plaintiff's laptop "refresh" was postponed. DSOF Attach. 13 ¶ 9. Despite the rule change, however, Defendant continued its policy of replacing an FSR's laptop—regardless of production level—if the laptop "completely stopped working." *Id.* In September 2012, Plaintiff experienced trouble with her laptop computer speed. PSOAF ¶ 5. Specifically, Plaintiff's laptop ran "[s]lower than slow," PSOAF Attach. 10, but still functioned. DSOF ¶ 67. Plaintiff requested to "be considered for a new refreshed laptop." PSOAF Attach. 10. Plaintiff ultimately did not receive a new computer until late October 2012, when her computer stopped working completely. DSOF ¶ 67.

### e. "E-Lead" Fees

Plaintiff's final perceived slight began when two "e-lead" fees were improperly assessed against her commissions. As stated above, Defendant's

Marketing Department develops sales leads and forwards the names and contact information of potential customers to FSRs. DSOF ¶ 12. Many leads are forwarded via email, and thus commonly known as "e-leads." *Id*. A computer program automatically keeps track of each "e-lead." *Id*. If an FSR makes a sale to a customer (or to a member of that customer's household) as a result of an "e-lead," the computer program automatically generates an email notice to the FSR stating than an "e-lead fee" will be assessed for that sale. *Id*. The FSR's commission is reduced by the amount of this "fee." *Id*. However, on occasion, an "e-lead" is sent to an FSR with a pre-existing relationship with the customer. *Id*. ¶ 17. In these instances, Defendant acknowledges that "e-leads" should not be assessed, since the FSR found that customer without aid from the "e-lead." *Id*. ¶ 16. To remedy such errors, Defendant established a process for protesting and canceling "e-lead" fees using a Lead Fee Dispute Database. *Id*. ¶ 17. Upon submission of documentation proving that the FSR's relationship with the customer pre-dated the "e-lead," the "e-lead" fee at issue is canceled. *Id*. During Plaintiff's course of employment, MetLife personnel helped at least "several dozen" FSRs protest "e-lead" fees, and FSR's won the majority of the fee protests in which they could demonstrate prior sales in the customer's household. *Id*.

On or about March 17, 2013, Defendant's computer program automatically assessed "e-lead" fees for two of Plaintiff's sales. DSOF ¶ 15. However, Plaintiff had a pre-existing relationship with both customers. *Id*. ¶ 16. As a result, Plaintiff believed, correctly, that she should not be charged any "e-lead" fees. *Id*.

At the time, Plaintiff's third-level supervisor was Peter Nejad ("Nejad"), the Regional Vice President. PSOAF Attach. 41, at 13:17-14:4. DesGroseilliers generally spoke with Nejad "every two to three weeks," but communicated more frequently if there was something "important" to speak about. *Id*. at 14:10-12. On March 26, 2013, Plaintiff complained to Nejad about the "e-lead" charges. PSOAF ¶ 9. Plaintiff did not speak to DesGroseilliers prior to speaking with Nejad. DSOF ¶ 22. Plaintiff told Nejad that she "was going to go outside MetLife to seek counseling or to talk with someone" about her complaints. DSOF Attach. 42, at 140:21-141:3. At her deposition, Plaintiff originally stated that "[she didn't] believe [she] told [Nejad] specifically who [she] was going to contact." *Id*. at 140:15-16. In a later declaration, however, Plaintiff asserted that, in fact, she specifically referenced the "EEOC [Equal Employment Opportunity Commission] or the Labor Board." PSOAF Attach. 1 ¶ 39. Regardless, Plaintiff has consistently maintained that Nejad responded by telling Plaintiff "she would have regrets" if she followed through with her intent, *id*.; DSOF Attach. 42, at 141:3-5, a claim Defendant vehemently denies. Def.'s Answer to Pl.'s Compl. [10] ¶ 17. Sometime later, DesGroseilliers learned of the discussion between Plaintiff and Nejad. DSOF ¶ 23.

The same day, Plaintiff called Defendant's Employee Relations Department. PSOAF ¶ 11. Plaintiff told the Employee Relations Department that she believed she had been improperly charged "e-lead" fees and discriminated against because of her race. *Id*. Plaintiff informed Employee Relations that she was thinking about going to the EEOC because of the treatment. *Id*.

The next day, March 27, 2013, Plaintiff received a call from Alfonzo McClaney ("McClaney") in Employee Relations. PSOAF ¶ 12. McClaney, at Nejad's request, called Plaintiff to follow up on her complaints. DSOF Attach. 8 ¶ 4. Plaintiff informed McClaney that she believed the "e-lead" fees had been charged to her because of her race. PSOAF ¶ 12. Following the call, McClaney discussed the situation with Michelle Lopez ("Lopez"), the Downers Grove agency's Marketing Manager. DSOF Attach. 37, at 1.

Shortly thereafter, Plaintiff called Lopez about the improper "e-lead" fees. DSOF ¶ 20; PSOAF ¶ 8. While the parties agree that Lopez admitted the "e-lead" fees had been assessed in error and explained the protest process, they diverge on Plaintiff's conduct during the call. Defendant describes Plaintiff as "very angry," and claims that Plaintiff accused Lopez of "taking money from her," "not understand[ing] the plight of salespeople," and "just sit[ting] around and collect[ing] a paycheck." DSOF Attach. 25. Plaintiff denies these claims. Pl.'s Resp. to Def. Rule 56.1 Statement [36] ¶ 20. The parties agree, however, that afterwards, Lopez notified DesGroseilliers of the conversation. *Id*. ¶ 23.

Following her conversation with Plaintiff, Lopez asked one of her assistants, Ryan O'Connor ("O'Connor"), to assist Plaintiff in resolving the "e-leads" issue. DSOF ¶ 21. O'Connor called Plaintiff. *Id*. Once again, the parties diverge on Plaintiff's conduct during the call. Defendant claims that Plaintiff asked O'Connor if he was white and made other inappropriate comments, including, "the slave days are over," "the time of white males being the dominant master is over," and "shame

on you, you're trying to take my money." DSOF Attach. 10 ¶ 8. Plaintiff denies these claims. Pl.'s Resp. to Def. Rule 56.1 Statement [36] ¶ 21. Plaintiff acknowledges, however, that she gathered relevant information and supporting documentation and faxed it to a number provided by O'Connor. DSOF Attach. 42, at 161:10-12. Plaintiff further admits that, shortly thereafter, she received a notice that the "e-lead" fees were cancelled, and that ultimately, she did not lose any money over the improper "e-lead" assessment. *Id*. at 164:5-15. Finally, the parties agree that O'Connor notified DesGroseilliers of the conversation. DSOF ¶ 23.

On April 1, 2013, Plaintiff spoke to her direct supervisor, Joseph Nicholson ("Nicholson"). PSOAF ¶¶ 1, 13. Plaintiff informed Nicholson that she would be filing a complaint with the EEOC or Labor Relations Board. PSOAF ¶ 13. The same day, Nicholson notified DesGroseilliers that Plaintiff intended to file a complaint, and that, at the time of their meeting, Plaintiff had "some sort of paperwork with her." DSOF Attach. 28. Nicholson also notified McClaney from Defendant's Employee Relations Department. *Id*. McClaney informed Nicholson that Plaintiff had expressed her concerns to other personnel and that he did not need to take any further action. DSOF Attach. 43, at 76:15-77:2. Sometime between April 1, 2013, and April 17, 2013, McClaney spoke to DesGroseilliers regarding Plaintiff's interactions with Lopez, O'Connor, and Nicholson. DSOF Attach. 8 ¶ 5.

On April 4, 2013, DesGroseilliers arranged a meeting with Plaintiff to take place on April 17, 2013. PSOAF ¶ 17. DesGroseilliers selected that date because it

was the first day that DesGroseilliers could sit down with employees at the Orland Park office. *Id.* ¶ 18. The parties disagree about the overall motivations for the meeting. Plaintiff asserts that DesGroseilliers scheduled the meeting to address Plaintiff's concerns about the "e-leads" and her allegations of discrimination. *Id.* ¶ 17. Defendant admits to these motivations, but adds that DesGroseilliers also scheduled the meeting to "coach" plaintiff about her inappropriate behavior towards Lopez and O'Connor. DSOF ¶ 25. Plaintiff contests this additional motivation. Pl.'s Resp. to Def. Rule 56.1 Statement [36] ¶ 25.

### f. The April 17, 2013 Meeting

### i. The Initial Meeting in DesGroseilliers' Office

At 9:00 a.m. on April 17, 2013, DesGroseilliers began her meeting with Plaintiff in DesGroseilliers' Orland Park office. DSOF ¶ 26. Also physically present was Michelle Juras ("Juras"), the Downers Grove agency Operations Manager. PSOAF ¶ 25. Carolyn Swick ("Swick") from Employee Relations participated by phone. *Id.* Nicholson was not present. *Id.*

DesGroseilliers opened the meeting by asking Plaintiff about the "e-lead" fee issue. PSOAF ¶ 26. Plaintiff and DesGroseilliers discussed the Paris Lewis incident, the DTP lead program, and Plaintiff's belief that she had been discriminated against based upon her race. *Id.* The conversation between DesGroseilliers and Plaintiff intensified to a point where Plaintiff told DesGroseilliers that Snoopy—Defendant's official mascot—needed to "get a suit because he's a pimp." DSOF ¶ 26.

From there, the parties' accounts once again diverge. Defendant claims that, during their initial meeting, Plaintiff was yelling at DesGroseilliers "so loudly that several people in nearby offices heard her." DSOF ¶ 25. Plaintiff denies these allegations, and counters that it was DesGroseilliers who acted "in a disrespectful, rude, and nasty manner." PSOAF ¶¶ 29-30. Defendant denies this accusation. Def.'s Resp. to Pl.'s Rule 56.1 Statement [39] ¶ 30. Plaintiff further states that DesGroseilliers angrily instructed Plaintiff that there were only three people Plaintiff could speak to about workplace issues: Nicholson (her direct supervisor), DesGroseilliers (her second-level supervisor), or Employee Relations. PSOAF ¶ 28. Plaintiff infers that DesGroseilliers' instruction was a response to Plaintiff's complaint to the EEOC. Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 8. Although Defendant admits that DesGroseilliers instructed Plaintiff on how to handle *internal* complaints (by not speaking directly to Nejad without first speaking to DesGroseilliers), it denies Plaintiff's implication that DesGroseilliers' directive included EEOC filings. Def.'s Resp. to Pl.'s Rule 56.1 Statement [39] ¶ 28. Eventually, Plaintiff ended the initial meeting and left DesGroseilliers' office. PSOAF ¶ 31.

### ii. The Second Meeting in DesGroseilliers' Office

Less than 30 minutes later, Plaintiff returned to DesGroseilliers' office to continue the meeting. *Id*. Plaintiff told DesGroseilliers that she felt the meeting was a setup to try to get Plaintiff to quit. *Id*. ¶¶ 30-31. The parties again disagree on Plaintiff and DesGroseilliers' demeanors. Defendant states that Plaintiff, "yelled

. . . [and] barely let [DesGroseilliers] get a word in edgewise." DSOF ¶ 29. Defendant further alleges that, when DesGroseilliers gestured for Plaintiff to leave her office, Plaintiff entered DesGroseilliers' personal space to the point that DesGroseilliers feared physical confrontation. *Id.* ¶ 31. Plaintiff denies these claims. Pl.'s Resp. to Def. Rule 56.1 Statement [36] ¶ 31. The parties agree, however, that Plaintiff eventually left DesGroseilliers' office and went to the employee break room. DSOF ¶ 31.

Following Plaintiff's departure, DesGroseilliers contacted McClaney at Employee Relations. DSOF ¶ 35; DSOF Attach. 41, at 97:22-23. DesGroseilliers confirmed that she could send Plaintiff home for the day and discharge Plaintiff if Plaintiff refused to leave. DSOF ¶ 35; DSOF Attach. 41, at 98:13-99:18.

### iii. The Final Confrontation in the Employee Break Room

A short time after Plaintiff entered the break room, Nicholson entered. PSOAF ¶ 35. DesGroseilliers and Juras joined shortly thereafter. *Id.* ¶ 36. Defendant describes what followed:

> In the break room, [DesGroseilliers] instructed [P]laintiff to go home for the rest of the day. Plaintiff refused, insisting she had to stay to complete a compliance module that was scheduled for that day. After [P]laintiff refused to go home, [DesGroseilliers] discharged her for insubordination.

DSOF ¶ 32. Plaintiff admits that she "did not immediately comply with [the] order given to her by DesGroseilliers." Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 12. However, Plaintiff describes the scene slightly differently:

> At that time, DesGroseilliers said that Plaintiff should go home . . . Plaintiff asked if she could stay in her office to perform some scheduled

compliance, and pulled out her phone to show DesGroseilliers her schedule. When Plaintiff went to show DesGroseilliers her schedule, DesGroseilliers immediately terminated Plaintiff for insubordination.

PSOAF ¶¶ 36-37.

## II.    Legal Standard

"Summary judgment is designed to head off a trial if the opposing party 'does not have a reasonable prospect of prevailing before a reasonable jury—that is, a jury that will base its decision on facts and the law, rather than on sympathy or antipathy or private notions of justice.'" *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir. 1991) (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)). "In Title VII cases, the courts take a critical look at efforts to withstand defendants' motions for summary judgment." *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994); *Palucki*, 879 F.2d at 1572-73. A district judge faced with such a motion must decide, subject of course to appellate review, whether the evidence is such that, "if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki*, 879 F.2d at 1572-73. Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making a summary judgment determination, the Court must

"construe all facts and reasonable inferences in favor of the non-moving party."

*Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 653 (7th Cir. 2010).

## III. Analysis

Plaintiff claims that her termination violated both Title VII and the IHRA. Both parties agree that, in analyzing discrimination and retaliation claims under the IHRA, "Illinois courts have looked to the standards applicable to Federal claims brought under Title VII." *Board of Trustees v. Knight*, 516 N.E.2d 991 (Ill. App. Ct. 5th Dist. 1987); *Guerrero v. T-Mobile USA, Inc.*, No. 13 C 1567, 2015 U.S. Dist. LEXIS 27466, at *25 (N.D. Ill. Mar. 6, 2015). "Because Title VII . . . and IHRA claims use the same standards, a plaintiff's failure . . . under Title VII for a given employment action necessarily forecloses . . . IHRA claims arising from the same conduct." *Guerrero*, 2015 U.S. Dist. LEXIS 27466, at *25. As a result, Plaintiff's allegations under both statutory regimes will be analyzed under prevailing Title VII precedent.

### a. Count I:  Race Discrimination Under Title VII and the Illinois Human Rights Act

Title VII prohibits the discharge of any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). The language of Title VII makes plain the purpose of Congress to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). At the same

time, "the federal courts are not arbitral boards, ruling on the strength of 'cause' for discharge." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996). Title VII does not require that "an employer's reasons for discharging an employee be correct, only that they be *nondiscriminatory*." *Bituin v. Supervalu, Holdings, Inc.*, 274 F. Supp. 2d 977, 984 (C.D. Ill. 2003) (emphasis added). The issue "is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is race." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996). Therefore, the "central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Id.*

As part of this inquiry, a plaintiff may "show discriminatory discharge by the direct method or the indirect method." *Burnell*, 647 F.3d at 708. Both methods will be discussed in turn.

### i. Direct Method[3]

To survive summary judgment under the direct method, Plaintiff must "present either direct evidence of discriminatory intent" or "enough circumstantial

---

[3] Defendant appears to confuse the direct method of proof with direct evidence of discrimination. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 n.3 (7th Cir. 2005). "The terminology in this area of law can be a bit confusing as the word 'direct' is used both for the 'direct method' and 'direct evidence.'" *Lewis v. City of Chicago*, 496 F.3d 645, 650-51 (7th Cir. 2007). "Such confusion is understandable; '[t]here are several cases that arguably conflate the direct method with direct evidence.'" *Id.* (quoting *Rogers v. City of Chicago,* 320 F.3d 748, 754 (7th Cir. 2003)). "The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of 'direct' evidence, which in an employment discrimination case would normally require an admission." *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 941 (7th Cir.1997) (internal citation omitted). "Despite the parties' apparent confusion," this Court will consider "both direct evidence and circumstantial evidence in [its] inquiry into whether [Plaintiff] has satisfied the direct method of proving race discrimination." *Rudin*, 420 F.3d at 720 n.3.

evidence to allow a rational jury to infer that discriminatory intent motivated [her] firing." *Id.*; *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009) ("A plaintiff proceeding under the direct method survives summary judgment by creating triable issues as to whether discrimination motivated the adverse employment action of which he complains"). Under the direct method, the term "direct evidence" includes evidence which, if believed by the trier of fact, will "prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Typically, direct evidence is "an admission by the decision-maker that his actions were based upon the prohibited animus. Needless to say, such admissions are rarely encountered." *Lewis*, 496 F.3d at 651 (quotations omitted).

Therefore, evidence "used in the direct method is 'not limited to near-admissions by the employer that its decisions were based on a proscribed criterion'" but also includes "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Id.* (quoting *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006)). Circumstantial evidence "typically falls into one of three categories: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question

but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 674-75 (7th Cir. 2012). A plaintiff "may survive a motion for summary judgment based only on circumstantial evidence under the direct method, but only if the circumstantial evidence presented points 'directly to a *discriminatory reason* for the employer's action.'" *Id.* at 675 (quoting *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1061 (7th Cir. 2003) (emphasis added)).

Here, Plaintiff fails to meet her burden under the direct method. First, Plaintiff presents no direct evidence of discriminatory intent. The record contains no admission—from either DesGroseilliers specifically or the Defendant in general—that Plaintiff's termination was based upon her race. Plaintiff's circumstantial proof is equally unpersuasive. Although Plaintiff's response points to the suspicious timing of her discharge, Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 6-7, her skepticism derives from the relation of her firing to either (a) Plaintiff's expressed intent to lodge a formal complaint with the EEOC, or (b) Plaintiff's objection to "e-lead" fees assessed against her commissions. *See id.* (Plaintiff states her case is supported by "the suspicious timing between her discrimination *complaints* and her discharge") (emphasis added). As a result, these arguments may be relevant to Plaintiff's retaliation claims in Counts II and III (discussed below), but are not probative to Plaintiff's charge of racial discrimination in Count I.

Plaintiff also presents no oral or written statements showing racial animus, or inappropriate behavior toward or comments directed at other African-American

employees. In her filings, Plaintiff references several employment issues that arose during the course of her employment, including: (1) the Paris Lewis incident; (2) elimination of DTP leads; (3) reinstitution of COGS charges for private office space; (4) postponement of Plaintiff's laptop computer "refresh"; and (5) improper imposition of "e-lead" fees.[4] However, the record is devoid of any evidence that such issues had anything to do with racial discrimination.

To the contrary, the record shows that Defendant's policies regarding DTP leads, COGS, laptop refreshes, and "e-leads" were broadly implemented—on either the agency or national level—based upon neutral, non-racial criterion. DSOF Attach. 41, at 47:23-51:8 (DTP leads); DSOF Attach. 41, 19:2-20:18 (COGS); DSOF Attachs. 4 ¶¶ 3-4, 38 (laptop refreshes); DSOF Attachs. 10 ¶ 5; 26 at 3, 43 at 21:3-22:17 ("e-leads"). In fact, the record indicates that for some of these programs, Defendant provided Plaintiff *preferential* treatment (although not on the basis of her race) until DesGroseilliers' arrival in January 2013. Plaintiff continued to

---

[4] In her response, Plaintiff also provided unsworn statements from Michelle Briggins, PSOAF Attach. 5, Tamala Jackson, PSOAF Attach. 7, and Kandi Keyes-Winford, PSOAF Attach. 8. These conclusory statements make generalized claims of white MetLife employees receiving preferential treatment. *E.g.,* PSOAF Attach. 5, at 2 ("It appeared that favor was given to Caucasian employees; such perks as being Agent of the day and/or qualified leads that weren't evenly distributed"); PSOAF Attach. 6 ("White Reps were the only ones who every [sic] received any leads"); PSOAF Attach. 8 ("There was truly a difference between the way Caucasian males and females were treated and the way African Americans [sic] male and females were treated at MetLife"). The generic nature of these unsworn allegations and their lack of connection to Plaintiff's discharge minimize any probative value they might possess. Furthermore, each of the aforementioned individuals' employment with Defendant terminated well before DesGroseilliers was hired as Managing Director. DSOF Attach. 11 ¶ 17. Regardless, Defendant requests that the Court strike these statements because they are unsworn. Def.'s Resp. to Pl.'s Rule 56.1 Statement [39] 1-3. "It is well settled that unsworn statements . . . are inadmissible to support or oppose summary judgment." *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 837 (S.D. Ind. 2014) (citing *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015)). Therefore, Defendant's request is granted, and the allegations levied in PSOAF Attachs. 5, 7-8 will not be considered.

receive DTP leads in 2011 and 2012, despite her failure to meet the requisite production threshold. DSOF ¶¶ 60, 62. Likewise, DesGroseilliers' predecessors waived certain of Plaintiff's COGS charges, including rent for private office space. *Id.* ¶ 54.

Plaintiff also claims that similarly situated employees outside her protected class received systematically better treatment (i.e., were not discharged under similar circumstances). In this regard, "similarly situated" employees must be "directly comparable" to the plaintiff in all material respects, but they need not be "identical in every conceivable" way, because the courts are looking for comparators, not clones. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal citations and quotations omitted); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 283 n. 11 (1976) (precise "equivalence" between employees is "not the ultimate question."); *Chaney v. Plainfield Healthcare Center,* 612 F.3d 908, 916 (7th Cir. 2010);. So long as the "distinctions between the plaintiff and the proposed comparators" are not "so significant that they render the comparison effectively useless," the similarly-situated requirement is satisfied. *Coleman*, 667 F.3d at 846. Nevertheless, there must be "enough common factors" to allow for a "meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.,* 481 F.3d 556, 560 (7th Cir. 2007). The "number [of relevant factors] depends on the context of the case." *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000). In the usual case a plaintiff must at least show that the comparators: (1) dealt with the same supervisor; (2) were subject to

the same standards; and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008); *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002)) (internal quotations omitted).

Here, Plaintiff's claim fails on at least the first and third factors. Plaintiff argues that for years, Plaintiff and her coworkers at Orland Park "observed multiple employees have outbursts in which they openly yelled at their assistants and Defendant's processing staff seemingly without discipline." PSOAF ¶ 3. Specifically, Plaintiff points to four employees as potential comparators: James Macak ("Macak"), Phil Brunstein ("Brunstein"), Jose Perez ("Perez"), and Tony Liace ("Liace"). DSOF Attach. 42, at 82:2-88:24.[5] According to Plaintiff, these employees occasionally lashed out at personal assistants or clerical staff when they became agitated, but were not disciplined. *Id.*

Nevertheless, Macak, Brunstein, Perez, and Liace are not "similarly situated" employees. Macak and Brunstein were supervised by Kim Taylor and Colleen Schueneman, *not* DesGroseilliers; and even though Perez and Liace both worked under DesGroseilliers, who personally "coached" them about treating co-workers with more respect, Perez and Liace disrespected *peers* or *subordinates*, not a second-

---

[5] In her response, Plaintiff also provided an unsworn statement from Brenda Zarko, PSOAF Attach. 6. This evidence also refers to an additional potential comparator: Argentina Niner. PSOAF Attach. 6. Defendant requests that the Court strike this statement because it is unsworn. Def.'s Resp. to Pl.'s Rule 56.1 Statement [39] 1-3. For the reasons stated in note 4, *supra*, Defendant's request is granted, and the comparator referenced in PSOAF Attach. 6 will not be considered.

level supervisor. DSOF Attach. 3 ¶ 10. Such behavior, unlike Plaintiff's disobedience, raised no concern that DesGroseilliers' supervisory authority "might be undermined" if she allowed the conduct to go without "decisive action in response." *Id*. ¶ 12. Plaintiff admits that, aside from Plaintiff, no other FSR yelled *at DesGroseilliers* (or her predecessors). DSOF ¶¶ 44-45. This distinction disqualifies the purported comparators from being "similarly situated" to Plaintiff. *See Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 478 (7th Cir. 2010) (insubordinate Plaintiff "similarly situated" only to other insubordinate employees).

In sum, Plaintiff fails to present sufficient evidence—either direct or circumstantial—to satisfy the direct method of proof.

### ii. Indirect Method

Of course, "'smoking gun' evidence of discriminatory intent is hard to come by." *Coleman*, 667 F.3d at 845 (citing *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes.")). Therefore, in a line of cases beginning with *McDonnell Douglas,* the Supreme Court developed a "burden-shifting framework known as the 'indirect method' of proof, designed to 'sharpen the inquiry into the elusive factual question of intentional discrimination.'" *McDonnell Douglas,* 411 U.S. at 792 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, n. 8 (1981)).

Under the indirect method, the plaintiff "carries 'the initial burden of establishing a prima facie case'" of discrimination. *Coleman*, 667 F.3d at 845

(quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). To establish a prima facie case of discriminatory discharge, Plaintiff must show that: (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated persons outside the class received more favorable treatment. *Burnell*, 647 F.3d at 709. Under the indirect method, the plaintiff's "burden" to offer a prima facie case of discrimination is not onerous, "rigid, mechanized, or ritualistic." *Coleman*, 667 F.3d at 846 (quoting *Burdine*, 450 U.S. at 253; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 (1978)). Rather, the Supreme Court merely created a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.*

Once a prima facie case is established, a "presumption of discrimination is triggered." *Id.* at 845. At that point, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for Plaintiff's termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Defendant offers a legitimate, nondiscriminatory reason for the termination, Plaintiff can survive summary judgment "only by proving that the employer's legitimate, nondiscriminatory reason is merely a pretext for discrimination." *Hosick v. Chicago State Univ. Bd. of Trustees*, 924 F. Supp. 2d 956, 970 (N.D. Ill. 2013); *Coleman*, 667 F.3d at 845. If and when the employee has "cast doubt" upon the employer's proffered reasons for the termination, then the issue of whether "the employer discriminated against the

plaintiff is to be determined by the jury—not the court." *Rudin*, 420 F.3d at 726 (quoting *Weisbrot v. Med. Coll. of Wisconsin,* 79 F.3d 677, 681-82 (7th Cir.1996)).

Defendant argues that even if Plaintiff can establish a prima facie case under the indirect method, her claim nonetheless fails because Defendant possessed a legitimate, nondiscriminatory reason for her termination: insubordination. Unless it serves merely as pretext, "insubordination can be a valid non-discriminatory justification for discharge." *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797 n.7 (7th Cir. 1997). Generally, the term pretext "means a lie, specifically a phony reason for some action." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (quoting *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1175 (7th Cir. 2002)). To show that an employer's proffered nondiscriminatory motive is pretextual, Plaintiff must present evidence suggesting that the employer is dissembling. The question is "not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Coleman*, 667 F.3d at 852 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). It is not the court's concern that an employer "may be wrong" about its employee's performance, or "may be too hard" on its employee; the only question is whether the employer's "proffered reason was pretextual, meaning that it was a lie." *Id.* (quoting *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)).

> "To meet this burden, [Plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the [Defendant's] asserted reason that a reasonable person could find it unworthy of credence. If the [Defendant] terminated [Plaintiff] because it honestly

believed she [was insubordinate]—even if this reason was foolish, trivial, or baseless—[Plaintiff] loses. On the other hand, if the stated reason, even if actually present to the mind of the employer, wasn't what induced [Defendant] to take the challenged employment action, it was a pretext."

*Id*. at 853 (internal citations and quotations omitted). In some cases, a plaintiff can show pretext "by showing that the defendant's reason for the adverse employment action: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013). Here, Plaintiff fails to sufficiently undermine Defendant's nondiscriminatory reason for Plaintiff's termination.

Plaintiff attacks the factual basis of Defendant's proffered justification by claiming that she "simply did not act in the insubordinate manner" as alleged by Defendant. Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 12. Specifically, Plaintiff maintains that she "did not yell at DesGroseilliers at any point on April 17, 2013" or "enter DesGroseilliers' personal space." *Id*. However, Plaintiff *does admit* that (1) she told DesGroseilliers that Snoopy—Defendant's official mascot—needed to "get a suit because he's a pimp," DSOF ¶ 26; and (2) at one point, "Plaintiff did not immediately comply with an order given to her by DesGroseilliers." Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 12. Thus, even construing all facts in the light most favorable to Plaintiff, the record contains a factual basis for the disobedience underlying Defendant's tendered motivation. Although Plaintiff disputes that Plaintiff's "single request to finish a work assignment" constitutes insubordination, *id.*, this Court "does not sit as a super-personnel department that reexamines an

entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Perhaps DesGroseilliers actions were unfair—clearly Plaintiff feels that they were—but there is no evidence that "they were unfair *because they were motivated by race,* as Title VII forbids." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (emphasis in the original). No matter how "medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," Title VII does "not interfere." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987).

Plaintiff's remaining arguments about the "oddities" surrounding Plaintiff's April 17 meeting with DesGroseilliers are equally unavailing. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 12. Plaintiff asserts that "DesGroseilliers' hostile and rude behavior," lends itself to an inference that she "sought to induce Plaintiff to resign or to take an action that could provide grounds for termination," Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 14, and that "Juras and Swick were participating in the meeting simply to act as witnesses to support DesGroseilliers' decision." *Id.* at 13. Similarly, she claims that Nicholson's absence indicates that DesGroseilliers "anticipated that there would be discipline or intended the situation to become volatile." *Id.* Finally, Plaintiff rounds out her theory by proffering that McClaney instructed Nicholson to take no action on Plaintiff's April 1, 2013 complaints "because he was aware that Plaintiff would soon be terminated." *Id.* at 13-14. However, Plaintiff offers no evidence to support her deductions. Under the summary judgment standard, this Court "construe[s] all inferences in the non-

movant's favor, but [she] is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Speculation does not "create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995).

In sum, Plaintiff's claim of discrimination based upon race fails under both the direct and indirect methods. To survive summary judgment Plaintiff must present sufficient evidence "to allow a rational jury to infer that *discriminatory intent* motivated [her] firing." *Burnell*, 647 F.3d at 708 (7th Cir. 2011) (emphasis added). On the record currently before this Court, Plaintiff fails to demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (quoting *Nagle*, 554 F.3d at 1114) (emphasis added) (internal quotations omitted). As a result, summary judgment on Count I is appropriate.

### b. Count II:  Retaliation Under Title VII and the Illinois Human Rights Act

Employers are prohibited from "punishing employees for complaining about discrimination or other practices that violate Title VII." *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). Like discrimination, retaliation may be established "by either the direct or indirect methods of proof." *Coleman*, 667 F.3d at 859.

### i. Direct Method

To establish retaliation under the direct method, Plaintiff must show that: (1) she engaged in activity protected by Title VII; (2) Defendant took an adverse employment action against her; and (3) there was a causal connection between her protected activity and the adverse employment action. *Coleman*, 667 F.3d at 859. Here, Defendant does not dispute that Plaintiff's internal complaints and pursuit of an EEOC charge constituted protected activity. Def.'s Mot. Summ. J. 10; *see Reed v. Innovative Health & Fitness Ltd.*, 259 F. App'x 875, 877 (7th Cir. 2008). Additionally, Defendant concedes that Plaintiff's termination constituted an adverse employment action. Def.'s Mot. Summ. J. 10; *see Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Analysis of the direct method, therefore, turns on causation.

To satisfy the causation requirement, the "protected activity of an employee making a retaliation claim must have been 'a but-for cause of the alleged adverse action by the employer.'" *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). The requirement of "but-for causation" in retaliation claims does not mean that the protected activity "must have been the *only* cause" of the adverse action; rather, it means that "the adverse action would not have happened without the activity." *Id.* (emphasis added). As in the discrimination context, Plaintiff may rely "on either direct or circumstantial evidence" to show that Defendant "was motivated to terminate [her] because of [her] protected activity." *Harper v. C.R. England, Inc.*,

687 F.3d 297, 307 (7th Cir. 2012). Because direct evidence "'essentially requires an admission by the employer,' such evidence 'is rare." *Id.* (quoting *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008)). Indeed, here, Plaintiff has not produced any direct evidence of a causal link between her complaints and subsequent termination.

Plaintiff may still satisfy the direct method "using what this circuit has termed a 'convincing mosaic' of circumstantial evidence." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) (quoting *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)) (internal quotations omitted). In the retaliation context, "circumstantial evidence of retaliation may include 'suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'"[6] *Id.* (quoting *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007). These "categories of evidence" are not exclusive, nor are they a "set of prongs of a circumstantial evidence" test. *Hobgood*, 731 F.3d at 644. When considering whether a plaintiff has met his burden "parties and judges too often lose sight of the purpose of these rhetorical tools." *Id.* Ultimately, Plaintiff must present "a convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission."

---

[6] The Seventh Circuit "frequently has recognized two additional categories of circumstantial evidence, which traditionally have been associated with the *indirect*, rather than the direct method of proof: (1) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; and (2) evidence that the employer offered a pretextual reason for an adverse employment action." *Harper*, 687 F.3d at 307 (quoting *Coleman*, 667 F.3d at 860) (emphasis added) (internal quotations and citation omitted). These additional categories are discussed in greater detail below.

*Coleman*, 667 F.3d at 860 (internal quotations omitted).  In other words, Plaintiff "must present admissible evidence that, when taken as a whole and viewed in a light favorable to [Plaintiff's] case, could convince a reasonable jury that [she] was the victim of unlawful retaliation."  *Hobgood*, 731 F.3d at 643.  Here, Plaintiff proffers evidence of purported suspicious timing and ambiguous statements by Nejad and DesGroseilliers.  Neither category averts summary judgment.

## 1. Suspicious Timing

Mere "temporal proximity between the statutorily protected activity and the action alleged to have been taken in retaliation for that activity will rarely be sufficient in and of itself to create a triable issue."  *Harper*, 687 F.3d at 308 (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).  However, together with other facts, suspicious timing can "sometimes raise an inference of a causal connection."  *Id.* (quoting *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008)).  That is, when "temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive" then "suspicious timing can sometimes raise an inference of a causal connection."  *Coleman,* 667 F.3d at 860 (citing *Magyar,* 544 F.3d at 772).  While the Seventh Circuit rejects "any bright-line numeric" rule, an interval of a "few weeks or even months" may provide probative evidence of the required causal nexus "when there is corroborating evidence of retaliatory" motive.  *Id.* at 861.  Suspicious timing is thus often an "important evidentiary ally of the plaintiff."  *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County, Ill.,* 269 F.3d

785, 790 (7th Cir. 2001)). "But 'ally' does not mean 'panacea.'" *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). The Seventh Circuit has cautioned that suspicious timing "'may be just that—suspicious,' and underscored the importance of context in assessing whether an inference of causality is warranted or not." *Id.* (quoting *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011)).

Here, Plaintiff's protected activity began on March 26, 2013, with her complaints of racial discrimination to Nejad and Defendant's Employee Relations Department. DSOF Attach. 42, at 140:21-141:3; PSOAF ¶¶ 9, 11. It continued on March 27th with her discussion with McClaney, PSOAF ¶ 12, and possibly to her conversations with Lopez and O'Connor. DSOF Attachs. 10 ¶ 8, 25. It continued further on April 1st with her notification to Nicholson of her intent to file an EEOC complaint. PSOAF ¶ 13. Finally, it extended to April 17, when, just prior to her termination, she expressed to DesGroseilliers her belief that she had been discriminated against based on her race. *Id.* ¶ 26. On these facts, Plaintiff's termination came only hours—and at most, three weeks—after her protected activity. Viewed in isolation, "this sequence of protected activity and punitive action could lend some support to a reasonable juror's inference of retaliation." *Davis*, 651 F.3d at 675.

However, such inferences "are apt only if we close our eyes to the other facts of this case." *Id.* An employee's complaint "does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior." *Hall*

*v. Bodine Elec. Co.,* 276 F.3d 345, 359 (7th Cir. 2002), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Thus, where a "significant intervening event" separates an employee's protected activity from the adverse employment action he receives, a "suspicious-timing argument will not prevail." *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (quoting *Davis,* 651 F.3d at 675). To hold otherwise "completely ignores the elephant in the room." *Davis*, 651 F.3d at 675.

In *Davis*, the appellant worked as a salesman for Time Warner. *Id.* at 665. The appellant claimed he was fired in retaliation for accusing a superior of treating his white subordinates more favorably than their African-American counterparts. *Id.* at 674. Appellant asserted that the fact "he was fired within days" of lodging his complaints warranted an inference of causality. *Id.* at 674-75. The District Court for the Eastern District of Wisconsin disagreed and granted summary judgment for Time Warner. *Id.* at 666. On appeal, the Seventh Circuit held "that there was a significant intervening event separating [appellant's] complaints from his discharge"—specifically, a questionable sales transaction that violated Time Warner's Employee Guidelines. *Id.* at 675. As a result, "no reasonable jury could cross the evidentiary chasm separating Davis's protected activity" from his termination. *Id.*

Here, as in *Davis*, Plaintiff's protected activity and subsequent termination are separated by a significant intervening event: her insubordination. The Seventh Circuit has "consistently held that an employee's insubordination toward

supervisors and coworkers, even when engaged in a protected activity, is justification for termination." *Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995), *as modified* (Sept. 7, 1995). Therefore, the "timing of events in this case does not give rise to an inference that [Plaintiff's] speech was a motivating factor in any of the employment actions taken against [her]." *Kidwell*, 679 F.3d at 957.

## 2. Ambiguous Statements

In addition to timing, Plaintiff points to Nejad's statement on March 26th that Plaintiff would "have regrets" if she went "outside Metlife" to discuss her complaints. Although Defendant denies this claim, for the purposes of summary judgement, we must credit Plaintiff's version of events. Regardless, Nejad played no role in Plaintiff's termination. Typically, "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir. 1989). Plaintiff attempts to conjure just such a basis. She claims that: (1) Nejad was DesGroseilliers' direct supervisor; (2) Nejad and DesGroseilliers typically spoke every two to three weeks and more frequently when something important arose; and (3) Nejad spoke to McClaney regarding Nejad's call with Plaintiff, and McClaney subsequently spoke to DesGroseilliers. Accordingly, it "would not be unreasonable for the jury to reach the conclusion that Nejad had a hand in Plaintiff's termination, either directly or through" McClaney. Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 8.

The record, however, directly contradicts the Plaintiff's proposed inferences.

Nejad stated that:

> Prior to [Plaintiff's] termination, I never had any discussion with [DesGroseilliers] about disciplining or discharging [Plaintiff]. Likewise, I never told [DesGroseilliers] that I was displeased with anything [Plaintiff] had said or done, or that I wanted her to be disciplined or discharged for any reason . . . I first learned about [Plaintiff's] termination after it occurred when [DesGroseilliers] notified me that she had discharged her for insubordination. I played no role in that decision, and did not know in advance that it was going to occur. Prior to discharging [Plaintiff], [DesGroseilliers] neither consulted with me about this decision nor sought my approval.

DSOF Attach. 9 ¶¶ 8-9. Similarly, DesGroseilliers declared that *she* "originated the idea to discharge plaintiff, no one else suggested it to me." Def.'s Reply Attach. 1 ¶ 18. Finally, McClaney stated that:

> Peter Nejad never told me, nor in any way suggested to me, that he was upset or angry at [Plaintiff] for anything she said in their March 26, 2013 telephone conversation. Likewise, [Nejad] never told me that he wanted plaintiff to be disciplined or discharged, nor did he ask me to relay any message along those lines to [DesGroseilliers], and I never did so.

Def. Reply. Attach. 2 ¶ 12. Plaintiff fails to present any *evidence* to combat these declarations. Plaintiff cannot create a "triable dispute of fact" if her only evidence is that Defendant's witnesses are "not worthy of belief," since that would be a "no-evidence case" in which Plaintiff must lose, because she "has the burden of proof." *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 815 (7th Cir. 2005). Put differently, it is impossible for Plaintiff to meet her burden of proof and demonstrate retaliatory conduct by "relying on the hope that the jury will not trust the credibility" of Defendant's witnesses – without "some shred of affirmative evidence to call into

question [Nejad, DesGroseilliers, and McClaney's] credibility, [Plaintiff] must lose." *Id.*

Finally, Plaintiff asserts that DesGroseilliers' instruction that Plaintiff only speak to Nicholson, DesGroseilliers, or Employee Relations about workplace issues alluded to Plaintiff's EEOC complaint. Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 8. The record, however, undermines the reasonableness of Plaintiff's purported inference. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) ("at the summary judgment phase, we make only reasonable inferences, not every conceivable one"). On March 26, 2013, Plaintiff first complained about the "e-lead" charges to her third-level supervisor and Regional Vice President for Defendant (Nejad). PSOAF ¶ 9. Before doing so, Plaintiff failed to speak to either her first-level supervisor (Nicholson) or her second-level supervisor (DesGroseilliers). DSOF ¶ 22. Thereafter, as Plaintiff admits, during the April 17, 2013 meeting, DesGroseilliers made no specific reference to the EEOC. DSOF ¶ 36. DesGroseilliers also confirmed the focus of her remarks upon the *internal* (rather than external EEOC) complaint procedures:

> During the April 17 meeting, I tried to explain that when routine issues arose, [Plaintiff] should address them through our normal chain of command by first bringing them to me or to her immediate supervisor (or to Employee Relations), instead of immediately escalating them to someone like my boss, Regional Vice President Peter Nejad . . . I absolutely never said anything about whether she was allowed to contact the EEOC (or any other entity *outside* MetLife), nor did I intend my comment to address that subject. I just explained the internal chain of command she should follow when she wanted MetLife to address a routine issue.

DSOF Attach. 3 ¶ 14 (emphasis in original).  The Plaintiff's own deposition further reinforces this record:

> Q.  Okay. Was there some discussion during this first meeting on April 17 about the *chain of command* and who you're supposed to talk to if you have issues?
>
> A.  She just told me that it was only three people that I could speak with.
>
> Q.  And who were those?
>
> A.  She told me Joe, human resources and herself.
>
> Q.  So your immediate supervisor, her or human resources?
>
> A.  Yes, sir.

DSOF Attach. 42 at 193:8-19 (emphasis added).

In light of such a record, the Plaintiff's suggested inferences are not reasonable. *Hobgood*, 731 F.3d at 644 ("ambiguous or isolated comments that stand alone are insufficient").  The ultimate question the parties and the court must always answer is whether it is "more likely than not" that the plaintiff was subjected to the adverse employment action because of her protected status or activity, and to answer that question, the "individual 'bits and pieces' presented by the plaintiff must be put into context and considered as a whole." *Id.*  Sometimes cases are presented in which a plaintiff does "not have a convincing mosaic" but rather only a few isolated bits or pieces, and these cases "recognize that a reasonable jury could not infer" that a plaintiff was a victim of illegal discrimination or retaliation. *Id.*  This case is no different.  DesGroseilliers' comment does not constitute "one among several tiles in an evidentiary mosaic depicting retaliatory

motive." *Coleman*, 667 F.3d at 860. Consequently, the record remains insufficient to support a judgment that DesGroseilliers was motivated to terminate Plaintiff because of her protected activity.

### ii. Indirect Method

Under the indirect method, Plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for its adverse action. *Id*. Although the "burden of production shifts to the defendant under this method, 'the burden of persuasion rests at all times on the plaintiff.'" *Id*. (quoting *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003)). Once the defendant presents a "legitimate, non-invidious reason" for the adverse action, the burden shifts back to the plaintiff to show that "the defendant's reason is pretextual." *Id*.

Here, Defendant claims that Plaintiff cannot establish a prima facie retaliation case under the indirect method. Def.'s Mot. Summ. J. [25] 13. The Court agrees. Although Plaintiff engaged in a statutorily protected activity and suffered an adverse employment action, Plaintiff fails to provide specific evidence that she was treated less-favorably than similarly situated employees who did not

complain of discrimination. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) ("plaintiffs have not pointed to any such person" and thus, we can "make short work of the plaintiffs' arguments under the indirect method"). Indeed, Plaintiff's filings only claim that she is entitled to a trial for her retaliation claims "under the *direct* method." Pl.'s Resp. to Def.'s Mot. Summ. J. [34] 5 (emphasis added).

### c. Count III: Retaliation Under the Illinois Wage Payment and Collection Act (IWPCA)

The Illinois Wage Payment and Collection Act (IWPCA) subjects to civil liability any employer who discharges "any employee because that employee has made a complaint to his employer" that he or she "has not been paid" in accordance with the provisions of the Act. 820 Ill. Comp. Stat. Ann. 115/14(c). Retaliation claims under Illinois law differ from federal retaliation claims under the *McDonnell Douglas* framework, where a plaintiff can "present a *prima facie* case and shift the burden to the defendant to provide a legitimate reason" for a termination, because Illinois law requires the plaintiff to offer "affirmative evidence of causation to survive summary judgment." *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 587 (7th Cir. 2014). Ultimately, this Court must determine "whether a jury could reasonably infer" that Defendant's motive for firing Plaintiff was retaliation for her complaints about improper "e-lead" deductions from her earned commissions. *Id*.

Here, a jury could not reasonably make such an inference. Plaintiff admits that multiple FSRs had issues with "e-lead" fees, and that Defendant implemented

a process to *facilitate* resolving such disputes. DSOF ¶ 17. Plaintiff further admits that FSR's won the majority of fee protests where they could demonstrate that they had made prior sales in the customer's home. Pl.'s Resp. to Def. Rule 56.1 Statement [35] ¶ 17. O'Connor alone helped "several dozen representatives" protest "e-lead" fees. DSOF ¶ 17. Where others complain of the same issue as Plaintiff, but are not subjected to the same adverse employment action, an inference of retaliatory intent is diminished. *See Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 589 (7th Cir. 2014).

Moreover, the evidence before this Court shows that Defendant reacted positively to Plaintiff's complaints. Plaintiff admits that neither DesGroseilliers, nor Nejad, nor other MetLife managers expressly discouraged Plaintiff from protesting "e-lead" fees. Pl.'s Resp. to Def. Rule 56.1 Statement [35] ¶ 39. To the contrary, Nejad stated that "shortly after I spoke to [Plaintiff] on March 26, 2013, I called Al McClaney, one of our Employee Relations consultants, and asked him to call [Plaintiff] and *help her* resolve the fee issue . . . I understood that MetLife's computer program sometimes made mistakes in assessing e-lead fees, and I wanted to see erroneous fees canceled or refunded." DSOF Attach. 9 ¶ 7 (emphasis in original). The next day, McClaney contacted Plaintiff at Nejad's request. DSOF Attach. 8 ¶ 4. McClaney also contacted Lopez, the Downers Grove agency's Marketing Manager, and Lopez spoke to Plaintiff about the process for protesting fees. DSOF ¶ 20. Following their conversation, Lopez immediately asked O'Connor to assist Plaintiff in resolving the "e-leads" issue. DSOF ¶ 21. O'Connor called

Plaintiff and helped her gather and submit relevant information and supporting documentation. DSOF Attach. 42, at 161:10-12. Shortly thereafter, Plaintiff received a notice that the "e-lead" fees were cancelled. *Id.* at 164:5-8. Ultimately, Plaintiff did not lose money over the improper "e-lead" assessment, and there is no evidence that her protest played any role in her termination. *Id.* at 164:9-15.

## IV. Conclusion

In light of the foregoing, Defendant's motion for summary judgment as to all counts is granted. Civil case terminated

IT IS SO ORDERED

Dated: June 28, 2015                          Entered:


_____
John Robert Blakey
United States District Judge